### LEONARD v. CUTLER–HAMMER MFG. CO. et al.

(Circuit Court of Appeals, Second Circuit.   February 16, 1909.)

No. 114.

PATENTS (§ 328*)—INVENTION—ELECTRIC CIRCUIT-CONTROLLERS.

The Leonard patent No. 673,274, for an electric circuit-controller, combining in the same device an overload and an underload switch, claims 1, 6, 7, and 11, are void for lack of invention in view of the prior art.

Claim 10, if given a broad construction, is also void for lack of invention. If limited to the form shown and described in the drawings and specification, *held* not infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 156 Fed. 791.

Wm. Houston Kenyon, for appellant.

Charles Neave, W. Clyde Jones and Robert Lewis Ames, for appellees.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

NOYES, Circuit Judge. This is a suit in equity to restrain the alleged infringement of letters patent No. 673,274 granted to the complainant April 30, 1901, for an improvement in electric circuit-controllers.

The patentee thus states the principal object of his invention:

"The object of my invention is mainly to provide a circuit-controller of the character referred to, with an electro-responsive device responding to abnormal increases in current, hereinafter referred to as 'overload-currents'; which will be effective at all times; that is, both while the controller is being operated by hand to adjust it to the normal position and after adjustment—the overload switch or controller operated or controlled by said electro-responsive device being operative to respond to an overload-current even while the switch-operating lever of the controller is being moved by the operator."

It will be observed, therefore, at the outset, that, while the patent is said to relate to circuit-controllers, its main purpose is to provide automatic protection against excessive or "overload" currents, when a manually operated starter is employed in an electric circuit. And at the outset it should also be observed that, while the claims of the patent are not limited to shunt-wound motors, the devices which they describe are in their useful application practically confined to the regulation of the flow of the current to motors of that character—as distinguished from series motors—and the case has been presented upon both sides as if the claims referred specifically to them.

Before examining the claims of the patent, therefore, it will be desirable to ascertain what shunt motors are, the difficulties and dangers attending their use, the early protective devices, and the situation existing when the complainant made his alleged invention.

Shunt motors are electric motors having a stationary field magnet and a revolving armature, both of which are wound with wire. The winding on the former is the field winding, and the winding on the latter is the armature winding. When the current traverses the two windings it magnetizes the field magnet and the armature magnet, and the former, by attracting and repelling the latter, causes the armature to rotate and enables it to do its work. The field winding and armature are connected in parallel branches or side by side between the electric mains instead of being in series. The current flowing through the field winding has only to magnetize the stationary element of the motor, and the winding is such that it is constant and small when compared

with that traversing the armature winding. The field magnet, therefore, has little need of protection. The armature winding, however, ordinarily offers little resistance to the current, and as the armature —the working part of the motor—has many different conditions to meet, it would be liable to be injured were it not that when once started it is able to automatically adjust itself to the amount of current, and, consequently, to the amount of work to be done.

This automatic action is effected by means of what is technically called the "counter electromotive force" of the motor armature. When the armature rotates it produces, by dynamo action, a back voltage or force proportioned to the speed, which operates in opposition to the current flowing from the source of supply. Thus when the motor has started and is running in normal operation, this counter force protects the armature from an excess of current and governs the flow when the work to be done varies. When, however, the motor is not running, no counter electromotive force is generated, and, if in this condition the full current is permitted to enter and bear upon the armature, it is liable to burn it out. The problem is to start the motor gradually and give the armature opportunity to catch up with its back pressure.

This problem was met early in the art by the use of a hand-operated starting rheostat or gradual-resistance switch in the line of the flow of the current to the motor. Such a switch usually consists of a series of resistance coils attached to adjacent contact segments which can be swept over by a pivoted switch arm. With such a switch the operator gradually cuts out the resistance sections, and as they are cut out the current in the armature tends to increase. But as they are being cut out the speed of the armature also increases, and it regulates itself by generating the back pressure, so that when they are all cut out it is running protected. The starting rheostat, therefore, without other device, serves to protect the armature in the admission of the current during the period of starting.

But should the current be suddenly shut off at any time after the starting switch has been closed, it would remain in an "on" position. Then, should the current be resumed, there would be nothing to protect the armature from its sudden inflow. The danger would not lie in the "no voltage" condition, but in the resumption of the current. To meet this contingency it was old in the art to provide an arrangement called a "no voltage" or underload switch or cut out which would open the circuit and protect the armature in case of the interruption of the current supply and return the contact lever to an "off" position. This was accomplished in a prior Blades patent by a device in which the contact lever was held in an "on" position when the current was passing through by a retaining magnet in the circuit acting in opposition to a retracting spring, and which was carried to an "of" position by the force of the spring when the current was interrupted.

This underload cut out, however, afforded no protection in the case of an excessive current without antecedent "no voltage" conditions. To meet this danger it was old in the art to arrange the apparatus so that the switch which was opened in the case of "no voltage" was also opened in the case of excessive currents. Thus in one form of the Fiske device an overload magnet was so arranged as to de-energize the

underload or no voltage magnet, release the resistance switch, and open the circuit in case of an excessive current, while also permitting the latter magnet to open the switch when de-energized by the failure of current. In another form, a single magnet was made to open the switch in response to either an excess or interruption of the current. But in all these cases the underload and overload devices operated only upon one and the same switch.

Independent devices for opening circuits in the case of excessive currents—overload circuit breakers—were also old in the art at the time of the complainant's alleged invention. At first fuses were provided which would carry the normal full-load current, but which would melt in the case of an overload and cut off the flow of the current before the motor could be injured. Fuses, however, were found to serve their purpose only imperfectly, and automatic overload circuit breakers came into use in electric circuits. In a common form of such a device a magnet was introduced into the circuit and became energized thereby. In case of an excessive current this magnet was so arranged as to actuate an iron core which unlatched the overload switch lever and opened the circuit. Fuses were commonly used with shunt motors, but whether the automatic circuit breakers were so used is a question which we need not now determine. Certainly there is evidence of such use.

The complainant contends that the development of electrical invention and use in the direction of the protection of shunt motors had not progressed further at the time of his invention than as we have just outlined. Whether it had progressed further is a question which we shall consider after examining the nature of the complainant's alleged invention and the claims of his patent which are in suit.

The conception of the patent goes further than the installation in the circuit of a shunt motor of the "no voltage" switch; goes further than the installation of the overload circuit breaker; goes further than, and meets the difficulties attendant upon, the installation of the overload and underload devices acting upon the single switch. It covers broadly the association in the same circuit of the underload and overload circuit breakers acting independently and automatically in response to the abnormal condition affecting them respectively. As stated by the patentee at the commencement of the patent:

"My invention relates to the class of switches or rheostats provided with means for automatically opening or closing, regulating, or otherwise affecting or changing the condition of a circuit upon the occurrence of an abnormal increase or decrease in current to prevent injury to the translating devices in the circuit, said means being controlled or operated by electro-responsive devices."

Complainant's counsel designates the device of the patent as a "double break" circuit controller. By the phrase "double break" it is appropriately only meant that, when the current is broken by the action of the overload circuit breaker, the magnet of the no voltage circuit breaker becomes de-energized and that switch opens also. One break in the circuit follows another break  It is of interest to note, however, that in the device which the complainant has made under his

patent it is doubtful whether the overload break does anything more than to initiate the second break. But this is not of importance.

Turning now to the claims of the patent, we find that the broad claims involved in this suit are 1, 6, and 11, while the structural claims involved are 7 and 10. We shall examine the former first. They read as follows:

"(1) In a circuit-controller, the combination of two independently-movable switch-levers, an electro-responsive device for controlling one of said levers and responding to failure or abnormal decrease of current to release said lever, means for moving said lever when released to affect the circuit, an electro-responsive device for controlling the other lever and responding to abnormal increases of current to release said second lever, and means for moving said lever, when released to affect the circuit."

"(6) In a circuit-controller, the combination of two movable switch members for controlling the same circuit, and two electro-responsive devices for controlling said switch members, each switch member and its electro-responsive device operating automatically and independently of the other to affect the same circuit, one when excessive current flows and the other upon failure or abnormal decrease of current."

"(11) In a circuit-controller, the combination of two movable switch members for controlling the same circuit, said members being adapted to be held in a normal operative position and operating respectively to effect the circuit upon the occurrence of overload and underload currents, and overload and underload electro-responsive devices functionally connected with said switch members and operating independently of each other to release the overload and underload switch members respectively."

These claims all embrace substantially the same elements, and with one exception, which we shall later notice, it seems unnecessary to differentiate between them. Claim 11 may be taken as illustrative. It covers a combination of the following elements in the circuit controller: (1) A movable switch member adapted to be held in normal operative position and operating to affect the same circuit as a second switch member upon the occurrence of overload currents. (2) Another movable switch member adapted to be held in normal operative position and operating to affect the same circuit as the first switch member upon the occurrence of underload currents. (3) An electro-responsive device functionally connected with the first movable switch member and operating independently of a second electro-responsive device to release the overload switch member. (4) Another electro-responsive device functionally connected with the second movable switch member and operating independently of the first electro-responsive device to release the underload switch member. In other words, the claim calls for a hand starter associated with: (a) A switch member and an electro-responsive device in conjunction therewith to open the circuit in case of an abnormal excess of current. This is the circuit breaker of the art which we have noticed. (b) A switch member and an electro-responsive device in conjunction therewith to open the same circuit in case of an abnormal decrease of current. This is the "no voltage" or underload cut out of the art which we have also noticed.

It will be observed that no electrical connections are prescribed in the claim, except that both switch members must control the same circuit. In fact, the patentee in his specifications disclaimed any particular connections:

"The electro-responsive devices may be connected in the circuit in any suitable way. They may be connected in series or otherwise and arranged in the path of the entire current flowing to the translating device, or arranged to be affected by only part of such current, or either or both devices might be in a different circuit from that in which the translating device is connected. When the apparatus is employed in the circuit of a motor, I connect the underload responsive device in most instances in series with the shunt field-winding of the motor and the overload responsive device in series with the motor-armature. * * * Nor do I claim herein the circuit connections for a motor-starting rheostat, as shown in Fig. 2, since all those features are made the subject of a divisional application."

"The translating device in the circuit"—in the language of the patent—which is to be protected by the association of the overload and underload switches is, according to all the testimony, the armature of the shunt motor, when they are used—as they are designed to be—with a motor of that class.

We have thus treated the broad claims as containing the same elements and as illustrated by claim 11. But the complainant contends that, while two circuit breakers arranged in the armature circuit would satisfy claim 1, their installation in the main circuit feeding both armature and field is required by claims 6 and 11. This installation would, it is said, not interfere with the "closed local loop" constituted by the shunt arrangement of the armature and field circuits, and would possess many advantages. But we find no warrant whatever for reading as an element the "closed local loop" into claims 6 and 11, nor is this loop a feature necessarily present in those claims. The patent disclaims specific connections, especially the connections of the only figure showing the "closed local loop." The claims read upon the figure which possesses no such loop. They only require the installation of the two circuit breakers so as to affect the same circuit. When they are used with a shunt motor the armature is the device needing protection, and all that the claims and specifications require is that the switches shall be arranged in the circuit to afford such protection. Claim 1 specifies, as complainant's counsel was particular to point out, that the switches shall affect "the circuit." Claims 6 and 11 provide that they shall affect "the same circuit." We see no distinction between the phrases, and think that both refer—when a shunt motor is used—to the circuit of the motor armature.

The defense to the broad claims of the patent is want of novelty, and in considering this defense we shall, for the purposes of this opinion, assume that certain of the contentions of the complainant are well founded. In the first place, we shall assume that, with only the separate use shown in the prior art of the underload and overload switches, patentable invention would have been involved in associating them in the same circuit as stated in the claims. In the second place, we shall assume that, with only the associated use shown in the prior art of underload and overload electro-responsive devices acting upon a single switch, patentable invention was involved in inserting in the circuit two independent switches and electro-responsive devices as stated in the claims. In the third place, we shall assume—and the evidence certainly supports such assumption—that the conception of the patent, if novel, possesses great merit and many advantages over the single-

break type of controller. In the fourth place, we shall assume that the claims in question were not anticipated in any earlier patent. In the fifth place, while we may briefly consider the matter of prior publication as indicating the teachings of the art, we shall assume that the defense of prior publication is not established. Finally, we shall assume that the date of the invention may be carried back from the date of the application—March 27, 1899—to April 17, 1897, when the complainant made a sketch in his note book. With these assumptions we have only to address ourselves to the questions of prior use as determining the novelty of the invention. In taking up this investigation, it will be well to see at the outset just what must be found in the prior art to anticipate.

Referring, then, to the claims, it appears that it will be necessary to find a prior use of a circuit controller with these elements: (1) A movable switch lever and electro-responsive device to open the circuit in case of an overload—an overload circuit breaker. (2) A movable switch and electro-responsive device to open the same circuit in case of an underload—a "no voltage" or underload cut out. And, going outside the claims, we shall assume that it is also necessary to show that the circuit-controller was used with a shunt motor, and that the translating device protected was the armature of such motor.

Turning now to the evidence, we find these facts with respect to what is called the "Shipbuilding Company use" established by documentary and parol testimony so clear as to carry conviction beyond any reasonable doubt: In 1896 the General Electric Company furnished to the Newport News Shipbuilding Company certain motor equipment for the coal trimmers of the steamship La Grande Duchesse. It was desired to operate the coal trimmers of this vessel by electric motors, and the correspondence, bills, and parol testimony show clearly that two 15 horse power shunt motors were supplied. These motors were to be directly connected to the sprocket shafts of the coal trimmers, which were liable to become jammed and to suddenly stop the motor. It would also be necessary sometimes to start the motor upon full load. Consequently the protection of an overload circuit breaker for the motor armature was required. And the protection of a no-voltage cut out was, of course, as necessary as in the case of any hand-starter. The General Electric Company, therefore, as appears by the correspondence, drawings, and parol testimony, furnished to the shipbuilding company a starting rheostat provided with a no-voltage release magnet and a type M—overload—circuit breaker. The testimony and sketches of the General Electric Company employés show that these two devices were intended to be put in the same circuit for the protection of the motor armature. The testimony of the electricians of the shipbuilding company is that the shunt motors and rheostats were installed, and that the underload and overload switches were in fact connected as they were intended to be. The testimony of these witnesses is also that the motors as so connected were used upon the vessel for the purpose for which they were designed. There is nothing to indicate that such use was unsuccessful, and, in view of the testimony concerning the merits of the associa-

ted use of the two circuit breakers, no reason appears why it should not have been successful.

Reading this testimony in connection with the broad claims in question, it seems clear that this prior use anticipates. One of the movable switch members of the claims is found in the switch of the circuit breaker used. It was held in normal position by a latch, and operated to affect the circuit upon the occurrence of an overload current. The overload electro-responsive device of the claims is found in the coil with its co-operating parts, which were functionally connected to the overload switch and operated to release it in case of excessive current. The second movable switch member of the claims is found in the rheostat arm of the starting box, which was normally held in operative position against spring action by the action of the retaining or "no-voltage" magnet, which, when de-energized, released it and allowed the switch to open. The second of the two electro-responsive devices was the retaining magnet and its co-operative parts, which were functionally connected with the underload switch member—the rheostat arm—and released it in case of no voltage. The two switch members operated independently to protect the same circuit—that in which the motor armature was located. This prior use took place before the patentee's date of invention, and more than two years prior to the date of his application. After the most careful consideration of the evidence covering this prior use, we are unable to see that it is open to the objections urged by the complainant, and are constrained to hold that it anticipates the broad claims in suit. And even if we were of the opinion that these claims covered some particular connections, so that there might be a doubt of strict anticipation, we should be obliged to hold that with separate and independent overload and underload switches in the circuit of a shunt motor—and also a manually-operated starter—shown in the prior art, the claims in question would be invalid for want of invention.

The complainant contends with respect to this prior use that there is no satisfactory evidence that the circuit connections of the motor were his particular connections. But, as we have already seen, the complainant in his patent expressly disclaimed having any particular connections. All that the claims require is the placing of the two switches in the same circuit. The specifications say that the devices are intended "to prevent injury to the translating device in the circuit"—the armature of a shunt motor—and the proof in the case of the shipbuilding company use is that both switches were installed in the same circuit for this very purpose.

The complainant also says with respect to this use and others:

"The two switches were so combined with each other and with the motor circuits as that they were not in series in the same circuit, and, in consequence, they, by their protective operation, broke the local loop containing the motor armature and field."

This contention is not, we think, well founded in fact. The testimony is that the two switches were installed in series in the same circuit—the circuit of the motor armature. This, according to all the experts, was the translating device to be protected. Moreover, while

it may be preferable to arrange the two switches so as to protect the field also by not interfering with the "closed local loop," as we have seen, there is nothing whatever in the claims in question regarding such an arrangement, nor is it required by the specifications.

In view of our conclusions concerning the shipbuilding company use, it is unnecessary for us to consider the testimony concerning other alleged prior uses contained in the record. One of these uses, however, we shall briefly refer to—the Government Printing Office use. We have carefully examined the testimony concerning this use, and are fully satisfied that prior to 1897 there were installed in the Government Printing Office at Washington and used in the same circuit of a shunt motor for the protection of the armature: (1) An automatic overload circuit breaker manufactured by the Cutter Electrical Company. (2) A starting box and no-voltage release attachment made by the Cutler-Hammer Company. This prior use seems clearly to anticipate the broad claims in question. And, as already pointed out, if there was a question about strict anticipation, with such a use in the prior art the claims would disclose no invention. The complainant seeks to discredit the testimony of the electricians in the Government Printing Office concerning this prior use. But while some minor inconsistencies in the testimony are shown, the witnesses seem to be entirely credible, competent, and disinterested, and no adequate reason is shown why their statements should not be accepted as the truth.

The complainant also urges, with respect to all the testimony concerning prior uses, that it is inherently improbable that prior to March, 1897, any one should associate in a motor circuit independent overload and underload switches; that such association was contrary to the teachings of the art. While we are not prepared to hold that with underload and overload switches used separately their association in a circuit for the protection of a shunt motor was obvious, we are certainly unable to assent to the converse proposition that it was so obscure as to be unlikely to be thought of. And with respect to the teachings of the art, we find in the Electrical World, of February 6, 1897, an illustrated article concerning circuit breakers in which it is said—apparently as nothing particularly new or novel:

"An automatic overload circuit breaker, which may be single pole, inasmuch as a double pole fusible cut out is usually installed, may be used in connection with any improved hand-starting box, preferably with a magnetic open circuit release."

For these reasons claims 1, 6, and 11 of the patent are held invalid for want of patentable novelty, and only the structural claims 7 and 10 remain to be considered.

Claim 7 is as follows:

"In a circuit-controller, the combination of two levers pivotally connected, a spring constantly tending to move said levers, a latch for holding one of said levers in its normal position, an electro-responsive device for releasing said lever, and the other lever carrying a keeper and normally held by an electro-magnet."

The spring, the latch, and the electro-responsive devices of claim 7 are manifestly old; are used for their ordinary purposes, and in the combination produce no new result. The only element which could

168 F.—17

be claimed to be at all novel is the mounting of the two switch levers upon the same pivot, and this seems to be the essential element of the claim. But the Gibbs patent (No. 555,503, dated March 3, 1896), the Schneider patent (No. 593,817, dated November 16, 1887), and an earlier Leonard patent (No. 568,088, dated September 22, 1896) show that it was old to mount two switches upon one pivot, and no new result is obtained by combining these pivotally mounted levers with the other elements of the claim. With the patents referred to in the prior art, claim 7 seems clearly invalid for want of invention. Indeed, the only apparent advantage arising from having the two levers "pivotally connected" is to make the apparatus more compact, and possibly to more conveniently permit the resetting of the levers. But even without the prior art we could hardly regard this mechanical arrangement as involving invention.

Claim 10 of the patent is as follows:

"In a circuit-controller, the combination of an overload-switch, a latch for holding said switch, a solenoid-magnet in the main current having a moving core for releasing said switch, and an underload-switch functionally connected with the overload-lever and normally held against a spring by a second magnet."

This claim is essentially for the "underload switch functionally connected with the underload lever."

The purpose of this functional connection between the two switches is to close the circuit breaker when the resistance lever is moved to its "off" position. But a similar functional connection of the two switches is found in the prior patent of the complainant (No. 568,088, dated September 22, 1896) as well as in other earlier patents. We think this claim, based broadly upon a functional connection of the two switches, is invalid in view of the prior art.

And, if the claim be given a narrower construction and be confined to the form illustrated in the drawings and shown in the specifications, the defendants' device does not infringe. When the underload switch lever of the patent is moved to the open position, it contacts with and carries the switch arm of the overload circuit breaker, closing the switch. The operating handle is upon the underload arm, and only one movement—that of the underload arm—is required or intended to be made. In the defendants' device, on the other hand, there are two handles, and two movements are required to close the two switches. The underload lever does not automatically close the overload lever, although the latter when open is so locked that it cannot be closed until the former is carried back to the open circuit position. In other words, the defendants do not employ the functional device shown in the specifications of the patent, but use an interlocking two-handle device along the lines of earlier patents. The rather indefinite suggestion in the patent that the invention includes within its scope means "whereby the underload switch could not be closed until the overload switch is closed" certainly does not embrace the defendants' structure, which requires that the overload switch shall not be closed until the underload switch is open.

For these reasons, the decree of the Circuit Court must be, and it is affirmed, with costs.