**GENERAL MOTORS CORP. et al. v.
ESTATE STOVE CO. et al.**
No. 11450.

United States Court of Appeals
Sixth Circuit.
Jan. 13, 1953.

Harry W. Lindsey, Jr., Chicago, Ill., George N. Hibben, Chicago, Ill., on the brief, Davis, Lindsey, Hibben & Noyes, Chicago, Ill., Robert R. Candor, Dayton, Ohio, of counsel for appellants.

Greer Marechal, Dayton, Ohio, Greer Marechal, Jr. and D. L. Bugg, Dayton, Ohio, Daniel L. Morris, New York City, on the brief, for appellees.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

This is an appeal from a judgment of the district court holding certain claims of patents [1] relating to broiling, baking, and roasting features of electric cooking stoves, patentable and infringed by appellants. For convenience, appellees and appellants will hereafter be referred to as appellee and appellant.

These patents, as contended by appellee, relate to an oven for an electric range which has upper and lower baking heating units which are manually connected to, and disconnected from, the electric power source, by a single switch which controls them both, simultaneously. The upper unit, in operation, has a lesser baking heat output than the lower unit, and the relationship between the baking heat output of the upper and lower units is claimed by appellee to be a nonvariable, fixed and predetermined relationship which may not be changed by the user and which, in operation, always gives a uniform oven heat, or proper heat balance, or, as plaintiff has termed it, "balanced heat" within the oven for baking. An automatic control, such as a thermostatically controlled switch, con-

[1] The patents in suit are: Bradbury, No. 2,055,246 for an electric range, filed November 15, 1928, and granted September 22, 1936, of which Claims 1, 11, 14, and 24 are in issue; Kahn, et al., No. 2,079,-618, for a stove, filed April 13, 1936, and granted May 11, 1937, of which Claims 2 to 6, inclusive, are in issue; and Kahn, et al., No. 2,123,699, for a stove, filed April 13, 1936, and granted July 12, 1938, of which Claims 4, 5, 6, and 9 are in issue.

646

nected into the oven circuits, turns the upper and lower baking units on and off intermittently, automatically, and simultaneously during a baking operation to maintain the same balanced heat relationship in the oven at all times during a baking operation, and to maintain the oven at substantially the selected degree of temperature setting. A further claim of the invention includes the use of a broiling unit within the oven which is likewise controlled by the single switch that controls the upper and lower baking units, as above explained, in such manner that the broiling heat may not be used simultaneously with the baking heat, thus preserving the balanced heat relationship within the oven during the baking operation. The district court found in favor of appellee on all of its foregoing claims and contentions.[3]

With regard to the invention in the Bradbury Patent, appellee maintains that it resides in the concept of "balanced heat" for baking—the even distribution of heat throughout the oven, secured by means of an upper baking element of smaller heat capacity than the lower baking element, as set forth in the claims.

It may here be remarked that appellee emphatically points out that before appellant had placed any of its allegedly in-

2. With regard to appellee's patent, the district court found that:

"Bradbury patent No. 2,055,246, in suit * * * is for 'Electric Range.' The patent states that the 'invention relates to the arrangement and control of heating elements for electric ranges.' Insofar as this suit is concerned, it relates to an oven for an electric range which has upper and lower baking heating units which are manually connected to, and disconnected from, the electric power source by a single switch which controls them both, simultaneously. The upper unit in operation has a lesser baking heat output than the lower unit and the relationship between the baking heat output of the upper and lower units is a nonvariable, fixed and predetermined relationship which may not be changed by the user and which, in operation, always gives a 'uniform oven heat' or 'proper heat balance' or, as plaintiff has termed it, 'balanced heat,' within the oven for baking. An automatic control, such as a thermostatically controlled switch, connected into the oven circuits, turns the upper and lower baking units on and off intermittently, automatically and simultaneously during a baking operation to maintain the same balanced heat relationship in the oven at all times during a baking operation and to maintain the oven at substantially the selected degree of temperature setting. The invention also includes the use of a broiling heat within the oven which is likewise controlled by the single switch that controls the upper and lower baking units as above explained, in such manner that the broiling heat may not be used simultaneously with the baking heat, thus preserving the balanced heat relationship within the oven during the baking operation."

The district court further found as a fact:

"No one, prior to Bradbury, had produced an electric range having a bake oven with oven heating equipment and controls provided with upper and lower baking heaters with a food space between them and both under control of a single handle or knob in which for baking heat both the upper and lower heaters were necessarily connected to the electric power source to be energized with the upper heater operating at lower heat output and the lower heater at higher heat output, for baking; the single manipulator being operable also to move the switch mechanism to disconnect the upper and lower heaters simultaneously from the 'baking heat' connection to the power source and to position a switch member to connect the upper heater only for high heat output from above for broiling, and to move the switch mechanism to still another, 'off', position to disconnect the oven heaters from the power source for non-operation of the oven. Nor had anyone prior to Bradbury produced such an electric range with an oven system provided with a single handle or manipulator and with such switch mechanism controlled thereby for connecting the upper and lower heaters to the electric power source as stated, and with the connections for the upper and lower heaters, during the 'baking' position of the switch mechanism, including also a thermostat for automatically and intermittently, and simultaneously, making and breaking the connection between the upper and lower heaters and the electric power source, for producing and maintaining balanced heat for baking within the oven space and at all times effective upon the foodstuffs being baked in the oven."

fringing electric ranges on the market, Westinghouse Company, then the second largest electric range manufacturer, sought a license under certain of appellee's patents, among others, those here in issue, and having secured it, extensively advertised and sold its ranges, emphasizing the "balanced heat" feature. It also appears that in 1940, before this suit began, appellant sought a patent claim for an electric oven heating system comprising broiling and baking circuits, with means for preventing the simultaneous energization of the broiling and baking features, which the Patent Office rejected on the ground that it had been "obviously fully met" by appellee's patent.

Appellant attacks the findings of the district court on the ground that "balanced heat" is a mere sales slogan and does not appear in the specifications; that the "fixed and nonvariable relationship" set forth in the findings of the court and emphasized by appellee in its brief likewise does not appear in the specifications of the Bradbury Patent, and can not be read into the claims; that there is no basis for the finding that Bradbury's invention embodied a single knob or switch control for controlling the fixed and nonvariable relationship in baking and also for controlling the broiling operation for the reason that this relationship is not recited in any of the claims; and that the findings of the district court in this regard were clearly erroneous.

It is contended by appellant that Bradbury, in Forms 1 and 3 of his patent drawings, shows two switches, one for baking and one for broiling; that while Form 2 has a single switch, it has three heats and is not fixed and nonvariable; that Claims 14 and 24 have nothing to do with broiling; that two switches are expressly called for in Claim 11; that Claims 1, 14, and 24 recite "switch means" broadly and read on each of Bradbury's three forms; and that none of the claims is expressly limited to one switch.

With respect to the claims of the Bradbury Patent of 1936,[3] here in issue, appellant submits that they merely follow the

3. The patent embodying such claims is designated as Bradbury, No. 2,055,246; and the claims in issue and found to be infringed are Nos. 1, 11, 14, and 24, of which 1, 11, and 24 have been designated as typical. Following are the above mentioned claims:

"(Claim) 1. An electric heating element arrangement for an electric oven comprising, in combination, a lower baking element and a top baking element of considerably less capacity than the lower baking element whereby an even distribution of heat is obtained within said oven, a top broiling element, all of said elements being located within said oven, and switch means for connecting said elements in a predetermined manner to a power source including means for preventing the energization of said top baking element with said top broiling element."

"(Claim) 11. An electric heating arrangement for electric ovens comprising, a broiling element, a top baking element, a bottom baking element of greater capacity than said top baking element providing for substantially even distribution of heat throughout said oven, all said elements being positioned to direct heat into the oven, switch means for connecting said baking elements to a source of power, a second switch means for connecting said broiling element to said source of power and adapted to interrupt the connections from said baking elements to said source of power when said broiling element is connected to said source, and thermostatic means in circuit with the first mentioned switch means and the baking elements for also controlling the connection of said baking elements to said source to maintain a constant temperature within said oven."

"(Claim) 14. An electric oven comprising in combination side and rear walls, a front closure, a heating element fixed at the top of said oven and extending in proximity to the side wall of the oven, a lower heating element adjacent the base of the oven of substantially greater capacity than said top heating element such that a baking heat is evenly distributed throughout said oven, means preventing direct radiation from said elements into the oven space, and means for simultaneously energizing said elements."

"(Claim) 24. An electric oven of the character described comprising a lower baking element, an upper baking element having smaller heat capacity than said lower baking element, whereby to secure

prior art; and appellant specifies, as the best examples thereof, the Hotpoint RA-73 range, the Capek Patent of 1891, the Smith "Wilwear" Patent of 1929, the McCormick Patent of 1928, and appellee's own Estate range models, No. 76 of 1924, and No. 84 of 1922.

In declaring that its invention of the Bradbury range introduced the concept of "balanced heat" in electric range cooking, appellee contends that such invention caused a complete departure, throughout the industry, from former electric cooking and electric range design; that it departed entirely from the prior concepts and practices of providing a large multiplicity of heat input relationships, variable at will by the user of the range, and of baking with bottom heat alone.

So-called balanced heat, then, as claimed by appellee, is effected by an electric oven, with an upper baking element having smaller heat capacity than a lower baking element, whereby, through substantially even distribution of heat throughout the oven, a balanced heat condition is secured within the oven space—together with a top broiling element adapted for directing downward radiation into the oven, with means for preventing energization of the broiling element simultaneously with the baking elements.

The essential nature of various processes of cooking is pertinent to this case, and certain preliminary observations on the subject are appropriate.

In broiling, heat is transferred from the heating elements to meat, for example, primarily by high intensity, high temperature radiation, so that the outside of the meat is seared and cooked quickly, and the inside portion is cooked to a much lesser degree.

In baking, the heat is transferred from the heating elements to the adjacent air, which expands and moves into contact with the food, that is, by convection, where the heat is conducted through the food mass. Some heat is transferred directly to the food through the racks and utensils in the oven; and, since each hot body in the oven radiates, to some extent, to each cooler part, some heat is also transferred to the food, in baking, by radiation. In baking, complex chemical changes are uniformly produced through the ingredients of the food. The heat radiation in baking is low intensity, low temperature radiation, as compared with the high intensity, high temperature radiation of incandescent heat sources, directly exposed to the food, as in broiling.

In roasting, the bulk of the heat is transferred into the center of the roast by convection and conduction, to cook the inside slowly. In roasting, some additional radiant heat may be desired in order to sear or brown the outside surface of the meat.

The Chief Engineer of appellant company, who was called to testify by appellee in accordance with Rule 43(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A.,

balanced heat conditions within the oven space, means preventing direct radiation from said elements into said oven, means for energizing said elements, a thermostat having a portion thereof within said oven space and subjected to the heat conditions within said oven space, means including said thermostat providing for coordinated heat control within said oven through said heating elements to connect the same to be energized when the temperature within the oven space, and effective upon the thermostat, falls below a predetermined minimum, said elements when energized supplying heat energy at a rate in excess of that required to maintain the oven with the desired temperature conditions therein, means including said thermostat for effecting deenergizing of said elements when the temperature within the oven space, and effective upon the thermostat, reaches a predetermined maximum value, said upper baking element being positioned above the level of location of the food material being baked to supply heat to be effective in the upper portion of said oven above said food and the lower baking element being positioned below the level of location of the food being baked and to supply heat to be effective within the oven and upon the thermostat therein from below said food, whereby the thermostat is effectively responsive to the desired balanced heat conditions as set up by the coordinated heating elements in the said oven space."

and who, from the witness stand, described these processes of broiling, baking, and roasting, declared, however, without contradiction, that there was no distinction between baking and roasting in so far as the conditions necessary for these operations were concerned; and, as appears from the evidence, the same heat conditions are used by appellee in its Bradbury range for both roasting and baking operations.

We come, then, to a discussion of the prior art, as it relates to the Bradbury Patent for balanced baking heat, with the use of an upper and lower heating element in the same oven, the lower element having a greater heat capacity than the upper; the single switch or knob by which both the upper and lower baking elements were energized, or connected, with the power source, and disconnected therefrom; the single broiling element of high heat output, connected with the electric power source by the same switch, and disconnected therefrom, as well as being turned to an "Off" position, disconnecting all oven heaters from the power source, and of such an arrangement that the switch could not energize or connect with the power source, the baking and broiling elements simultaneously; the use of a thermostat for automatically and intermittently, and simultaneously, making and breaking the connection between the upper and lower heaters and the electric power source for producing and maintaining balanced heat for baking within the oven space and at all times effective upon the foodstuffs being baked in the oven.

Francis H. McCormick, the Chief Engineer of the Electric Stove Division of appellant company, who, since 1915, has been engaged in the testing, designing, and engineering of electric ranges, was, as heretofore stated, called as a witness by appellee under Rule 43(b) of the Federal Rules of Civil Procedure. Subsequently, he was also called as a witness for appellant.

As appellant's witness, McCormick specified the Hotpoint RA-73 as one of the best prior uses against the Bradbury Patent. This Hotpoint range had been designed under McCormick's direction, and manufactured and sold commencing in 1925. From the evidence, it appears that the Hotpoint RA-73 had heating units at the bottom and at the top of the oven. Each of these units was separately and independently controlled by its own three-heat switch, which had a "High," "Medium," and "Low" position, in addition to "Off."[4]

On the first page of appellant's exhibit of an oven chart for this range, automatic heat control with a thermostat was emphasized as "The most wonderful thing in cookery." It was stated: "The 'Heat Control' maintains the oven temperature at any required degree of heat * * *. It will maintain this temperature constantly during the cooking operation." As to the temperature to be utilized, the chart went on to recite that "The usual switch control is the lower unit 'High.'" But it further stated: "We suggest that you try the other controls for some of your work. Possibly you will like upper unit 'Low' and lower unit 'High' or 'Medium.'" On the second page of the oven chart, the instructions for using the combinations on the Hotpoint range were that, for baking, in most cases, only the bottom unit be used, and the top unit, turned off. The directions in the chart for baking numerous different kinds of food prescribed turning the upper unit to "Off," with the lower unit turned to "High" or "Medium." However, in baking sugar cookies, the chart indicated the lower unit should be turned to "High," and the upper unit, to "Medium," for a total cooking period of four to five minutes. There was, however, considerable contradiction with respect to these various directions, for the "Recipes and Instructions for Hotpoint Electric Ranges," prepared and issued by the same authority who prepared the directions for the oven chart for the Hotpoint Company, set forth in the recipe

---

**4.** Appellee points out that all of these positions could be used separately on each burner or heating unit, thus giving fifteen different heat combinations available to the user of the range, but this refers to a different aspect of the case, which is discussed later.

for baking sugar cookies, that the upper unit should be turned to "Off," and the lower unit, to "Medium." Moreover, at the top of the second page of the oven chart, it was also stated: "The lower Oven Unit is the one you depend upon for all baking purposes." However, for leg of lamb, roast beef, and roast pork, the oven chart specified that the lower unit should be turned to "High," and the upper, to "Low." This, appellant submits, clearly discloses that the idea of using an upper heating element of smaller heat capacity than the lower heating element in the same oven, for baking purposes, was old prior to appellee's patent. Appellee pointed out that the purpose of turning the upper unit on was for roasting and to provide extra browning on the roast, and that this was not, in fact, a baking operation. McCormick testified that, in roasting, the meat was supported in a pan placed in the normal baking space and was subjected to heat from the lower element and, occasionally, from the upper element as well, adding that it was desirable to have a considerable amount of top heat in roasting; and, with reference to the baking of sugar cookies, he stated that they could use quite a lot of top heat for adequate browning. But, as heretofore mentioned, McCormick clearly testified that there was no distinction between the baking and roasting operations as far as the heating arrangements within the oven were concerned.

Whatever the two terms, baking and roasting, may signify as far as exact definition goes, their connotations seem to be practically the same as far as the evidence in this case discloses. For, in addition to McCormick's uncontroverted statement on the subject, it appears that appellee, in its 1932 catalog, recited the most important services required of an electric range—"baking, roasting, broiling, oven canning and the preparation of complete oven dinners." According to the catalog, broiling, in appellee's range, is accomplished by turning to the "Broil" position on the knob. The only other cooking position on the knob is for baking. There is no contention made that meat can be roasted with broiling heat from above. This would indicate that in appellee's own range, the roasting and baking operations are accomplished in the same way. And this is the fact. Likewise, in the Hotpoint range of 1925, the roasting process was achieved in the same way that the baking process was achieved by the Bradbury range, being done in an oven in which the lower heating element was of a greater capacity than the upper heating element. If baking and roasting can be said to be the same or practically the same process, it was done—and directed to be done—with various foods, in the Hotpoint range of 1925, by use of greater heat in the bottom heating element than in the top heating element; and this idea, in itself, could not, therefore, be said to be new with appellee's invention.

Moreover, it appears that thousands of Hotpoint RA-73 ranges, which were sold prior to the Bradbury range of 1928, were equipped with thermostatic controls; and appellee company knew of these thermostatically equipped ranges before the advent of the Bradbury range. If, then, foods such as roasts were cooked as directed by the cooking instructions issued by the manufacturers of the Hotpoint range, with an upper heating element using less heat than the lower heating element, and the degree of heat in the oven was thermostatically controlled, the process of cooking in the Hotpoint range was the same—except for the amount of heat emanating from the two elements—as in the Bradbury range—that is, with less heat from the upper element than from the lower element—which is the main factor whereon appellee bases its claim of "balanced heat."

As to the Capek Patent, No. 462,532, which McCormick described as one of the references of the prior art, it related to an electric oven having a heater at the bottom thereof and another heater above it which could be raised or lowered within the oven. The mechanism provided for using either the upper or lower heater alone, or for energizing both simultaneously at full wattage. It appears that high intensity broiling heat was impossible to produce in the oven at the time the patent was issued since high temperature resistance wire was not in use in 1891, the date of the patent.

The specification, however, stated that "The upper heater is * * * adapted to produce a slower and a more moderate heat." There was no provision for a broiler. The evidence discloses that after 1920, when thermostats were used in electric stoves—a considerable time prior to the Bradbury range—it would have been a comparatively simple thing, involving some mechanical or electrical skill, to attach a thermostat to a Capek range.

McCormick also selected as one of the best patent references against the Bradbury Patent, that for the so-called Smith "Wilwear" range of 1926, No. 1,721,191. It was the patent and not the range which the witness selected as a reference. This patent related to a small kitchenette type stove made in sections, which could be bought separately, to be used alone or placed one upon another. The oven constituted a separate section which could be used on the stove, or separately, on a table. The oven was 12 inches square, with 8 inch cooking units at top and bottom. There were four switch positions, "Off," "Start," "Broil," and "Cook." On "Start," the bottom coil was energized to preheat the oven for stewing and boiling, baking and roasting. On "Broil," the top coil alone was energized to its greatest heat for broiling; on "Cook," the upper and lower coils were connected in series consuming half the current and developing half the heat as when the lower coil, or the upper coil, was used alone. In the "Cook" position, the wattage was equally divided between the upper and lower coils, each coil giving equal heat at a low value, and in this position, the heat was "continued for as long as may be necessary," for baking or roasting.[5] It was set forth in the specifications that "One advantage of this invention is that food may be baked in the oven simultaneously from the top and bottom causing a more even distribution of heat through food, and considerably reducing the baking period." Alva T. Smith, the inventor of this range, also appeared as a witness and,

among other matters, testified that although the wattage was at first equally distributed between the upper and lower heating elements of the oven, he discovered that better cooking results could be obtained by putting more wattage in the bottom heater. Smith further stated that, although the company manufacturing these ranges had made a certain number with an equal distribution of wattage between the upper and lower oven heaters, soon after 1926, "I don't think we made many that did not have more load in the bottom than we did in the top." It did not explicitly appear how long after 1926 such ranges were manufactured, but Mr. Smith left the company in the spring of 1928, which was some time before Bradbury made application for his patent on November 15, 1928.

McCormick also selected as one of the best references against the Bradbury Patent, his own patent No. 1,672,724, applied for in 1926, and testified that a single handmade experimental model had been produced and tested for about six months in his own home. There was, however, no proof of any public use of the range and it was the patent, not the range, that was selected as a reference. The oven had an upper and lower heating unit, the upper, of 1400 watt capacity, and the lower, of 600 watt capacity. It is set forth in the specifications that both units are to be turned on at full capacity "for quick heating." Broiling was accomplished by direct radiation from the top element. Throughout the specifications and claims, it is stated that the lower unit alone maintains "a very satisfactory" or a "desired" baking temperature for normal operation. The specifications go on to state that "With the lower heating unit connected alone, as indicated * * *, the input will be 600 watts which in the oven under consideration maintained a very satisfactory baking temperature." However, it is further stated in the specifications that "When the two units are connected in series, as indi-

5. The specifications stated that "A still further advantage is that the oven with its hollow insulated walls will operate on the well-known 'fireless cooker' principle, permitting the cooking of the food to be continued after the current has been turned off."

cated * * *, the energy input will be 420 watts total, 295 watts being taken by the lower unit and 125 by the upper unit, which gives a very satisfactory temperature and heat distribution for lower temperature baking and boiling." The claim further states that while the lower unit was to be used alone for high temperature cooking operations, the two units, upper and lower, were to be connected in series for low temperature cooking operations. The broiling position was the same as the high position for preheating, with the lower unit also on. We find here, then, a patent setting forth the use of an oven utilizing heat simultaneously from two baking elements, an upper baking element using less heat than the lower baking element, for low temperature baking.

Appellee's own Model No. 84 of 1922 had a baking oven and a separate broiling compartment. An independent broiling element was at the top of the broiling compartment and was controlled by its own switch. The baking oven had a top heating element comprised of four electrically connected rectangular-shaped cast-iron clad heaters. The resistance wires were insulated from and baffled by the cast-iron casings. The lower heating element in the baking oven was identical to the top one except that the bottom heaters were circular. The top element had a 1500 watt capacity and the lower one, an 1800 watt capacity, and these elements were controlled by a single three-way switch having "Off," "High," "Medium," and "Low" positions. With the switch in "High" position for preheating, both elements were energized at their capacities. In "Medium" position, the top element was energized at 1500 watts, and the bottom element was unconnected. In "Low" baking position, the top element was energized at 450 watts, and the lower, at 375 watts. These ranges were provided with thermometers but not themostats. The evidence was, however, to the effect that it would have been a simple matter for an engineer or a mechanic to install a Hart thermostat in this type of oven.

Another reference, appellee's Model No. 76 of 1924, had a single oven. The bottom heating element had three cast-iron clad heaters similar to the Model 84 top heaters. The top element was an open resistance coil. The heating elements were controlled by a single three-way switch having the positions, "Off," "Broil," "High," and "Low." The capacities of the top and lower heating elements were 1300 watts and 1700 watts respectively. With the switch in "High" for preheating, the elements were energized at their capacities. In "Low" position, the top element was energized at 425 watts and the lower, at 375 watts. In "Broil" position, only the top unit was energized—at 1300 watts. Mr. Hart explained how the range could have been equipped with his thermostat.

In considering the use of so-called balanced heat for baking in the Bradbury Patent, it must be kept in mind that baking at constant high temperature is carried on with both top and bottom heating elements shielded, or baffled. If the top element is not shielded or baffled, then, instead of high temperature baking heat, one has direct radiant broiling heat of high temperature, which may burn the food to be baked or otherwise fail to give proper top baking heat. If the top heating element is baffled or shielded, broiling can not be carried on in the same oven. It was for these reasons that, prior to Bradbury, broiling and baking operations in an electric range were carried on in separate compartments or ovens, or, when carried on in the same oven, the top unshielded or unbaffled heating element was used as a baking element at a temperature greatly reduced from that used for broiling. In other words, an upper open coil adapted, at high temperatures, for broiling, could, at reduced temperatures, be used as the upper baking element. It is only a matter of choice as to whether a baffle or reduced temperature be used to prevent high intensity radiation in the upper element, and so adapt it for top baking heat. Bradbury, it may be said, first used broiling heat and high temperature baking heat from upper and lower elements in the same oven of an electric range. This he provided by the use of two coils in the top of the oven—one, an outer coil which was baffled, for baking opera-

tions, and the other, an inner unbaffled coil, separate from, and independent of the outer coil and used for intense radiant broiling heat. The baffle plate covered the baking coil, but not the broiling coil. Bradbury further provided that the bottom baking element and the top baffled coil for baking could not be turned on at the same time as the unbaffled upper coil for broiling. We shall briefly revert to this hereafter, but shall, here, consider it as bearing upon what follows as to Bradbury's claimed contribution of baking by means of balanced heat.

Bradbury, then, prior to his application for the patent here in question in 1928, knew of, or had available the knowledge of the electric model ranges and models above mentioned in which baking was carried on in an oven with a top heating element of less capacity than the bottom element. In McCormick's patent of 1926 for an electric range, the specifications set forth, for low temperature baking, a wattage of 295 for the lower heating element, and 125 for the upper, which, in the language of the patent application, gave "a very satisfactory temperature and heat distribution for lower temperature baking." In appellee's own model electric range of 1922, the capacity of the upper element was 1500 watts, and the lower, 1800 watts. It is true that these "High" positions were energized for preheating, and that the cooking was afterward carried on in the "Low" position in which the top element was energized at a slightly higher wattage—450 watts—than the lower, at 375 watts. However, it appears from the evidence that thermostats were in rather general use, both in electric ranges and gas ranges, at this time, and that a thermostat could easily have been installed in appellee's 1922 range, with the result that, in such a case, the baking operation could have been carried on with the switch at "High," with the upper heating element at 1500 watts, and the lower, at 1800 watts. In this range, the upper element was shielded, or baffled, so that direct radiant heat at high temperature would not cause burning, the broiling element in this range

being in a separate compartment. In appellee's 1924 model, with the upper heating element of 1300 watt capacity, and the lower, of 1700 watt capacity—both energized at full capacity for preheating—the cooking was thereafter carried on in the "Low" position, with the top element energized at 425 watts, and the bottom, at 375 watts. The use of a thermostat would not, in this range, have permitted the cooking operation to be carried on at the "High" position, with the continuous higher wattage and constant higher temperature—although the thermostat automatically would turn the oven on and off in such a way as to maintain the exact temperature required—for the reason that the upper heating element was not baffled. This top element was an open resistance coil enabling broiling to be done in the same oven in which the baking operations were carried on, and, consequently, the high broiling radiant heat, being unbaffled, was not adaptable for top baking heat. However, the use of a thermostat on appellee's 1922 model would have resulted in a baking operation similar to that in the Bradbury range of 1928, here in question, as far as balanced heat goes. Some of these Bradbury ranges were sold without thermostats; some, with them. In a Bradbury range without the thermostat, the oven switch for baking was turned to "High," with the top element at 1200 watt capacity, and the bottom element, at 2200 watt capacity, until the desired temperature was reached. The knob or switch was then turned to "Low" for a few minutes, and then, "Off," and the baking was finished in the stored-up heat in the oven. In the same Bradbury 1928 ranges that were sold by appellee, equipped with thermostats, the oven switch was kept at "High" at all times—that is, with the top element at 1200 watts and the bottom at 2200 watts—the thermostat automatically turning the oven on and off in such a way as to maintain the exact temperature required.

The significant purport of the foregoing is that the installation of a thermostat in appellee's 1922 model of an electric range would have resulted in or produced the

same kind of balanced heat for cooking operations as was obtained in appellee's Bradbury range which is the subject of this patent controversy; and the addition of thermostats to electric ranges, at that time, was a question of choice. They could be quickly and easily installed, but they added greatly to the expense of the ranges. Moreover, the Hotpoint RA-73 ranges,[6] which were equipped with thermostats, before the advent of appellee's Bradbury range, operated as did Bradbury's range on the so-called balanced heat principle of lesser heat from the top heating element than from the bottom heating element, for a number of kinds of food, especially meats.

Finally, Mr. Kahn, in testifying for appellee, stated that some of appellee's ranges, prior to Bradbury, had less wattage in the top element than in the bottom element; and, in reply to a question whether, with respect to its ranges made and sold prior to 1928, appellee had suggested the use of less heat at the top than at the bottom of the oven for baking purposes, while his answer somewhat trailed off to the effect that the witness was under the impression that "there is something on that thing in our catalogs," it appears, nevertheless, that appellee inserted advertisements of its ranges in trade magazines, and in June 1928, about five months before Bradbury made application for his patent, appellee advertised, with respect to its electric ranges, as follows: "Balanced oven heat—The wattage in the oven is so distributed between the upper and lower baking coils as to give perfect balance of heat in the oven at all times. This has not been possible heretofore, where it has been necessary to use the upper baking coil as a broiler unit."

The foregoing evidence could hardly be said to disclose that the principle of baking in an oven of an electric range with an upper heating element of less heating capacity than the lower element was a novel contribution to the art. Rather, it would appear that baking by so-called balanced heat clearly antedated Bradbury's Patent.

In this regard, certain observations may be made with respect to the efficient factors in producing such balanced heat and their relation to the claims set forth in the patent.

The main factor in effecting so-called balanced heat was the thermostat. This remarkable contrivance, which has, in one way or another, come into use in multifarious ways in almost every home in this country during the past thirty years, has revolutionized methods of household work, heating of houses, cooking, lighting, and other similar incidents of the daily living of people.

When the first Bradbury 1928 ranges were placed on the market, appellee's Vice President, Kahn, testified that some were equipped with thermostats, others were not; that appellee did not then know how successful would be the sale to the public of ranges equipped with thermostats; that there was a substantial difference in cost because of thermostatic equipment; and that this was the reason both types were placed upon the market. However, the public certainly received from appellee the impression that both types of ranges utilized "balanced heat." The description in the catalogs stated:

"The 'high' and 'low' on the oven switch are used when baking, and on these two points, *the balance of the oven is maintained at all times.* The oven is heated by turning the oven switch to 'high' until the desired oven temperature is reached, *on ranges without ThermEstate* (the thermostat), then the oven is turned to 'low' for a few minutes. The oven is then turned off and the baking is finished on the stored heat in the oven.

"In ranges with ThermEstate Oven Heat Control, the ThermEstate automatically turns the oven on and off so as to maintain the exact temperature

---

6. The Hotpoint range had a baffled lower heating element and an unbaffled upper heating element. Because the top element was not baffled, it could be used as an upper baking element only at lower temperatures. The upper heating element was used at high temporatures for broiling in the same oven.

desired. When using the ThermEstate, the oven switch is kept at 'high' at all times."[7]

Although the catalog thus sets forth that in baking in the 1928 Bradbury range without a thermostat, the "high" and the "low" on the oven switch maintain the balance of the oven at all times, Mr. Kahn stated, as a witness, that in such a range, without a thermostat, cooking a ten-pound turkey, for instance, would be done in the same fashion as in Estate's model range 76 of 1924. This was described by the witness as being done by preheating the oven, then placing the turkey therein, and continuing the cooking on the "low" position of the switch for 60 minutes. The switch was then turned to "Off" and the cooking process continued on the stored-up heat for another 190 minutes. Yet on the "low" position in the 1928 Bradbury range, Mr. Kahn testified that more heat came from the top heater than from the bottom heater. This was entirely contradictory to appellee's claim that balanced heat consisted of less heat from the top heating element than from the bottom. Therefore, in the Bradbury range, so-called "balanced heat," as claimed by appellee, could not be and was not maintained "at all times" when the oven switch was at the "low" position, as appellee set forth in its catalogs which were distributed to the public at the time of the sale of such ranges.

On cross examination, Mr. Kahn repeatedly declared that, without a thermostat, the Bradbury range here in question could not have achieved so-called "balanced heat."

In the four claims here in issue, balanced heat is not intimately or clearly tied to the use of the thermostat. Claim 1 is for: "An electric heating element arrangement for an electric oven comprising, in combination, a lower baking element and a top baking element of considerably less capacity than the lower baking element whereby an even distribution of heat is obtained within said oven * * *." "Even distribution of heat" is, according to the evidence, equivalent to "balanced heat." Here is a claim, then, embodying what is testified as being one of the unique contributions to the art—"balanced heat." But in this claim, a thermostat is not mentioned; and, as stated, appellee's evidence is to the effect that balanced heat could not be obtained in a Bradbury range which was not equipped with a thermostat.

Claim 11 is for: "An electric heating arrangement for electric ovens comprising, a broiling element, a top baking element, a bottom baking element of greater capacity than said top baking element *providing for substantially even distribution of heat throughout said oven,* all said elements being positioned to direct heat into the oven, switch means for connecting said baking elements to a source of power, a second switch means for connecting said broiling element to said source of power and adapted to interrupt the connections from said baking elements to said source of power when said broiling element is connected to said source, *and thermostatic means* in circuit with the first mentioned switch means and the baking elements *for also controlling the connection of said baking elements to said source to maintain a constant temperature within said oven."* Here it would seem that the greater capacity of the lower heat-

7. It was further set forth in the catalogs for appellee's Bradbury ranges, under the heading of "Balanced Oven Heat": "But the most important feature of this oven cannot be seen at a glance. Balanced Oven Heat!—insuring baking that is evenly browned on all sides, top and bottom; perfect results—every time.

"A tremendous amount of research and experiment is back of the attainment of this goal—an oven in which the heat is accurately balanced between the top and bottom units, instead of being divided equally between them, as is the common practice."

The oven is then described in detail, under headings of "One-Piece Oven Linings," "One-Piece Oven Ledges," "Double Insulation," "Oven Vent," the suspension of the door, the control by separate switches, the wattage, and the terminals. Mr. Kahn, however, testified that no statement appeared in the catalogs which points out that "Balanced Oven Heat" does not apply to ranges which do not have thermostats, and that the only difference specified in the catalogs between ranges with and without thermostats was indicated in the directions for use, heretofore quoted.

ing element is the determining factor in providing for the even distribution of heat or balanced heat—in the same sense as in Claim 1—and that the thermostat is for the maintenance of the constant temperature.

Claim 14 described a top heating element and a lower heating element of substantially greater capacity, "such that a baking heat is evenly distributed throughout said oven * * *." No mention in this claim is made of a thermostat, without which, according to the testimony of appellee's Vice President, baking could not be carried on with an even distribution of heat, or "balanced heat."

Claim 24, the last of the four claims in issue, mentions the relationship of the two heating elements—the upper of less heat capacity—"whereby to secure balanced heat conditions within the oven space." It goes on to speak of a thermostat to provide for coordinated heat control within said oven, with the upper heating element, being above the level of the food being baked, to supply heat to be effective in the upper portion of the oven, above the food being baked, and the lower baking element, being below the food, supplying heat to be effective within the oven and upon the thermostat therein, from below the said food, "whereby the thermostat is effectively responsive to the desired balanced heat conditions as set up by the coordinated heating elements in the said oven space."

It may be added that of the seven figures of the drawings of the Bradbury Patent, the first five do not show a thermostat, without which so-called balanced heat could not be obtained.

With respect to the balanced heat obtained by Bradbury, the patent specifications set forth that "in accordance with this invention the capacity of the top heating element is about half that of the lower baking element or from about 40% to 70% of the latter dependent upon the oven form and insulation, and thus when both elements are effective the oven temperature will be substantially uniform throughout."

The claims, however, which measure the grant to the patentee, set forth that the capacity of the upper heating element is "smaller" or "considerably less," or that the capacity of the lower is "greater" or "substantially greater." The Capek Patent stated that its upper heater had "a slower and more moderate heat." McCormick's specification states that his wattages gave "a very satisfactory temperature and heat distribution." In the Hotpoint range, on "Low," the upper wattage was 25% of the lower wattage, and on "Medium," it was 50%, which was within Bradbury's above mentioned range of capacities. In appellee's later model subsequent to the Bradbury Patent, the wattage of the top baking element was 30% of that of the lower baking element. This gives color and substance to McCormick's testimony on the subject of the heating arrangement in an electric stove when he stated that "The problem of providing uniform heat distribution for a wide variety of food loads in an oven is perpetual and continuing;" and it further points up Smith's work with his patent "Wilwear" range, as disclosed by his testimony to the effect that toward the end of his researches, he discovered that he got better cooking results by putting appreciably more wattage in the bottom heater than in the top, contrary to his earlier ideas on the subject. There appears no scientific proof that any certain proportions of heat between an upper and lower heater in an oven give perfectly balanced heat, or an even distribution of heat throughout the oven.

In the light of the foregoing, the claims of Bradbury with respect to obtaining balanced heat by the use of upper and lower heating elements of differing capacities appear too indefinite to sustain a finding of validity on this aspect of the patent. See General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232.

With respect to the broiling element, functioning in the same oven as the baffled baking elements of the Bradbury range, this was novel. Prior thereto, baking with baffled top and bottom elements was carried on in one oven, and the broiling operation, with an unbaffled top broiling element, in a different oven; or, if baking and broiling

were done in the same oven, the top element was unbaffled in both operations—in baking, operating at a low temperature in combination with the bottom baffled baking element, and in broiling, with the top element only, turned on at full capacity. But placing an unbaffled broiling unit, operating on one switch in the top of the oven, and, at the same time, placing a baffled baking unit, operating independently on another switch, also in the top of the oven, can not be said to be invention, and, in fact, it is not clear that invention is claimed by the appellee for this particular arrangement.

We have already mentioned that a rather detailed description of these units, switches, and their operations, had appeared in appellee's advertisements many months prior to the filing of Bradbury's application for his patent.

Appellant argues that what appellee contends the Bradbury Patent consists of, is not, for the most part, recited in the patent claims and can not be read into the claims; that the district court was induced to make erroneous findings in disregard of the real claims and specifications; that it described features that are not mentioned in the claims; and that such description did not apply to any range marketed by appellee earlier than 1939, which was fifteen years after the filing of Bradbury's application and thirteen years after its issuance. Omitting discussion of this argument, we consider, briefly, the findings of the district court.[8]

As to the finding that the Bradbury Patent "relates to an oven for an electric range which has upper and lower baking heating units which are manually connected to, and disconnected from, the electric power source by a single switch which controls them both," this was old, and would not, in any event, constitute invention. Mr. Kahn testified, on behalf of appellee, that "We had an electric range prior to the Bradbury development having an upper heater and a lower heater in the baking compartment, controlled by a single switch." Further, with respect to the finding that "The upper unit in operation has a lesser baking heat

output than the lower unit and the relationship between the baking heat output of the upper and lower units is a nonvariable, fixed and predetermined relationship which may not be changed by the user * * *," this was, in so far as baking with less top heat than bottom heat is concerned, a part of the prior art, as has been outlined in the preceding discussion; and in so far as the nonvariable, fixed, and predetermined relationship goes, it appears that there was such a relationship between the baking heat of the upper and lower units of the oven in Estate Model 76 of 1924. In fact, Mr. Kahn testified that the switch in this range operated these units in a "predetermined" manner.

The next finding of the district court set forth that the predetermined relationship operated to give "uniform oven heat," "proper heat balance," or "balanced heat." We have heretofore held that if such balanced heat meant baking with less heat from the top of the oven than from the bottom, such method of baking clearly antedated Bradbury; and we have further concluded that the claims of Bradbury with respect to obtaining balanced baking heat were too indefinite to sustain a finding of validity.

It has already been noted that a thermostat, operating to turn the upper and lower baking units on and off intermittently, automatically, and simultaneously during the baking operations, and maintaining the heat relationship in the oven at selected degrees of temperature, was used long prior to Bradbury. The finding—if a finding of invention—that the Bradbury "invention also includes the use of a broiling heat within the oven which is likewise controlled by the single switch that controls the upper and and lower baking units as above explained, in such manner that the broiling heat may not be used simultaneously with the baking heat, thus preserving the balanced heat relationship within the oven during the baking operation," is vitiated by the evidence that the single switch of McCormick, "Wilwear," and the Estate 76 could not be on "bake" and "broil" simultaneously, and that on July 2, 1928, several months before Brad-

8. See Footnote 2, 201 F.2d 646.

bury made application for his patent, appellee had already manufactured and shipped an electric range which embodied in it means to prevent energization of the top broiling element with the top baking element, so that, when the baking elements were energized, the broiling element would not be energized.[9]

The district court found that no one, prior to Bradbury, had produced an electric range embodying all of the elements, broiling and baking heaters in the same oven, switches, thermostat, and means of operation found therein. But taking these, seriatim, as in the court's finding,[10] there was nothing new about an electric range with a baking oven with oven heating equipment and controls provided with upper and lower baking heaters with a food space between them, and both under control of a single handle or knob, in which, for baking heat, both the upper and lower heaters were necessarily connected to the electric power source to be energized with the upper heater operating at lower heat output and the lower heater at higher heat output, for baking. Nor was it new to make use of the single knob or manipulator, controlling the baking heaters, also to move the switch mechanism to disconnect the upper and lower heaters simultaneously from the "baking heat" connection to the power source, and to position a switch member to connect the upper heater only for high heat output from above for broiling, and to move the switch mechanism to still another, "Off," position to disconnect the oven heaters from the power source for non-operation of the oven. It is true that, as found by the court, no one, prior to Bradbury, had produced such an electric range with an oven system provided with a single

handle or manipulator and with such switch mechanism controlled thereby for connecting the upper and lower heaters to an electric power source, as stated, and with the connections for the upper and lower heaters, during the "baking" position of the switch mechanism, including also a thermostat for automatically and intermittently and simultaneously making and breaking the connection between the upper and lower heaters and the electric power source for producing and maintaining the balanced heat for baking within the oven space and at all times effective upon the foodstuffs being baked in the oven. The difference in the prior art was that these functions, instead of being utilized by means of a single knob controlling switches, operating on the heaters and on the thermostat, were utilized by two knobs—one knob controlling the switches operating on the heaters, and the other knob controlling the switch operating on the thermostat.

With all of these components admittedly old, does the combination of them in the Bradbury Patent constitute invention? They perform no additional function in the combination other than they perform out of it. It is true that in the combination, they add greatly to the convenience of the user of the electric range compared to what had been the case prior thereto. As an instance, either broiling or baking could now be carried on in the same oven. One knob controlling baking and broiling operations, and a predetermined constant temperature, resulted in a considerable advantage, from the standpoint of convenience, over the use of two knobs for these various functions. Further, the fact that, at the baking position on the single knob, a fixed tempera-

9. Mr. Kahn testified: "We had an electric range prior to the Bradbury development having an upper heater and a lower heater in the baking compartment, controlled by a single switch which was so connected that the upper and lower heaters could be jointly energized in parallel for high heat, and in another position of the switch in series for low heat, and in the third position of the switch only the upper heater was energized for broiling. The high heat position in parallel was not a baking position but was used to heat up the oven before the baking started. The

low heat position was sometimes used for a short time after the baking started to make up for heat losses resulting from introduction of food into the oven. The third or broiler position, in which only the top coil was energized, was used only for broiling and never for baking. I might add there, also, that this manner of operation is clearly set out in our 1922 and 1924 catalogues and in our cooking instruction cards appearing in those catalogues."

10. See Footnote 2, 201 F.2d 646.

ture of top and bottom heaters was obtained, with less heat from the top than from the bottom—which, as a result of experiment, was found to give what was claimed to be substantially even distribution of heat in the oven—for high temperature baking, was of great help to the user of an electric range, simplifying the cooking operations, and enabling them to be carried on at constant high temperature. But Bradbury was working in a crowded art. These various functions separately were disclosed by prior patents and prior ranges and their uses, with various heating elements and thermostats.

■ "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008. See also Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58.

"The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. *Elements may,* of course, especially in chemistry or electronics, *take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics."* Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. (Emphasis supplied).

The district court made no finding that the old elements constituting the Bradbury range performed any additional or different function in the combination than they performed out of it. In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 154, 71 S.Ct. 127, 130, the Supreme Court emphasized the significance of the absence of such findings, in the following language:

"This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test.

"Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it. * * *

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. * * *

"The defect that we find in this judgment is that a standard of invention appears to have been used that is less exacting than that required where a combination is made up entirely of old components."

■ Since the elements of the combination in the Bradbury Patent do not perform additional or different functions in the combination than they do out of it, their combination does not partake of the quality of invention.

Our views that the Bradbury Patent was invalid make it unnecessary to discuss appellee's claim that the patent was infringed;[11] but our examination of the record and a consideration of the range which

11. On the question whether the court should rule on infringement, although the patent has been found to be invalid, see the illuminating discussion in the concurring opinion of Judge Frank in Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 292. See also Butex Gas Co. v. Southern Steel Co., 5 Cir., 123 F. 2d 954 and Interchemical Corp. v. Sinclair & Carroll Co., D.C.N.Y., 50 F.Supp. 881. Judge Simons, for this court, has pointed out certain qualifying circumstances in the matter of passing upon validity, as well as infringement, in Landis Machinery Co. v. Chaso Tool Co., 6 Cir., 141 F.2d 800, 805. See also Dow Chemical Co. v. Skinner, 6 Cir., 197 F.2d 807. The Supreme Court has discussed related questions in Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S. Ct. 860, 83 L.Ed. 1263; Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.

is claimed to infringe, lead us to the conclusion that appellant, in its structure, followed the prior art.

The district court further found that appellee's Kahn and Hake [12] patents were valid and infringed; and appellant contests such findings. These patents relate to the oven heating units for baking and broiling; the electric circuits and structures for connecting them to an electric power source, interconnecting them to each other, and interrelating their operations; the switches for controlling such circuits; the thermostatic mechanism for selecting and maintaining oven temperature and maintaining baking heat; and the selective operation of all components for all oven functions by a single control handle or knob. It is the one-knob arrangement for carrying out all of the foregoing operations that is the gist of the claimed invention in the patent in question.

In each patent, when the single knob is manipulated to a "Bake" position, the upper and lower heating elements in the oven are connected to the electric power source and the thermostat set to the desired degree of temperature to attain and maintain so-called balanced heat for baking in the oven. After the oven is brought up to the selected temperature, the thermostat automatically and intermittently turns both upper and lower elements off and on, simultaneously, in fixed relationship of lesser heat output from above than from below. Thus, when the single knob is moved to the "Broil" position, the baking elements are simultaneously disconnected from the power source and the upper heating element connected to the power source for broiling heat output. While the knob is in the "Broil" position, the baking circuits can not be energized, and conversely, when the knob is in a "Bake" position, the broiling circuit can not be energized. When the knob is in the "Off" position, all the heating elements and heating circuits are positively disconnected from the power source and can not be energized.

Ed. 1450; Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S. Ct. 1143, 89 L.Ed. 1644.

These patents, and the prior art switch structures, as suggested in the briefs, are complicated structures, and are fully understood only by reference to the drawings, specifications, and claims of the patents themselves. For the purposes of this opinion, the following abbreviated description may serve.

Both patents have a temperature responsive arrangement of a hollow expansible bellows connected by a tube to a hollow bulb positioned within the oven. The bellows, tube, and bulb are filled with liquid which expands when heated and contracts when cooled, causing corresponding expansion and contraction of the bellows. Such bellows movement moves a lever, which opens or closes switch contacts controlling energization of the baking element circuits. A stud engages the bellows and carries at its other end a thread nut which engages and controls the movement of the lever to open or close the switch upon the movement of the bellows. A screwing nut along the stud closer to or further from the bellows alters the amount of expansion of the bellows which will occur before the lever is moved to open the switch, and, hence, alters the temperature at which the switch will open. This adjustment of the nut, and, consequently, selection of the oven temperature, is effected by rotating it with a rod attached to a thermostat dial on the outside of the range. This same control dial also actuates other mechanical members to control an additional switch for the broiling element. The switch broil arrangement comprises various switch contacts. One set of these contacts is on the sliding bar which is always urged by springs in a direction tending to close the switch contacts. The other end of the bar carries a roller which engages the edge of the dial. These parts are so interrelated that, with the roller bearing upon the edge of the dial, the sliding bar is forced back and held with the switch in open position. The edge of the dial has an indentation; and when the dial is rotated to "Broil" position, this indentation admits the

12. Nos. 2,079,618 and 2,123,699.

roller, thus permitting the spring to move the bar toward the dial and close the switch to the broiler element. The main structural difference between the internal mechanisms in these two patents relates to the structure by which the bake switch is positively blocked open whenever the broiling switch is closed and whenever the dial is in the "Off" position.

Notwithstanding these complicated structures, the important consideration on this aspect of the case is the admitted fact that the wires, knobs, switches, heating elements, springs, bellows, rollers, and other elements are all concededly old, as are various combinations of many of them. What is here contended by appellee is that these various elements are interrelated in these patents in a new way to achieve new results never before obtained solely by reason of their interaction with each other. The main object of the patents is to provide a stove having "a simple and effective means for controlling the oven temperature and for assuring proper control of the heating elements," and "more particularly to control means for regulating an oven of a stove," and this means is effected by a single control knob. Appellant contends that no invention resides in this device.

With all these elements admittedly old, we come, then, to the question whether these patents, integrating the upper and lower heating units, thermostat control, line switch, bake switch, broil switch, and thermostat setting dial (all of which had previously been operated separately by two control knobs) and combining them into an arrangement to give a single unified oven heating system under the control of a single knob, were valid, or invalid for want of invention.

The issue in this regard resolves itself into a determination whether the integrated operation of the switches by the one knob constituted invention, and in arriving at our conclusion, we proceed to a consideration of the various patents and models, which appellant submits discloses prior use.

Among appellee's different electric cooking stoves appears Estate Model 76, of 1924, having a single oven with a thermometer, but no thermostat. It included top and bottom heating elements controlled by a single switch, which gave the following combinations and wattages: in "High" position, the top, 1300 watts, and the bottom, 1700 watts. In the "Broil" position, the top had 1300 watts, and the bottom, nothing. In the "Low" position, the top had 425 watts, and the bottom, 325 watts. According to the evidence, the oven could have been equipped with a thermostat.

In a 1928 range, appellee provided the oven with three coils: top bake element with lower metal shield, inner exposed broiling element, and a bottom baking element also covered by a metal shield. The broiling element was controlled by one switch, and the baking elements by another. These baking elements were of predetermined wattage relationship so that, when energized for baking and controlled by a thermostat, they gave the desired heat at both the top and bottom of the oven in correct proportion to produce uniform oven heat distribution. The predetermined wattage and heat relationship between top and bottom elements was fixed and was always present when the elements were so energized. Thus, the desired conditions were maintained throughout the baking operation and the thermostat controlled energization of both of the elements simultaneously for that purpose. Desired changes of temperature for different cooking operations were secured by means of the thermostat which in different dial settings, maintained the adjusted proportions above described. A three-heat switch was provided for the control of the baking elements, which had "High," "Medium," and "Low" positions. The ranges were equipped with the "Hart" thermostat, consisting of rod and tube thermostat with relay control for opening and closing the circuit to the bake elements. Originally, the broiling switch was not interlocked with the bake switch, and both bake and broil elements could be energized at the same time. During 1928, appellee was trying to secure switches which could be used to interlock the baking and broiling elements, to prevent the simultaneous energization of both of them. Apparently it

was thought that such switches could be purchased from producers of electrical equipment, but appellee found that no suitable ones were commercially available.

In appellee's Model 582T range of 1929, one knob controlled the bake and broil operations, and another controlled the thermostat.

The Electrochef Range Model B, of 1930, had a single knob controlling the electric oven baking and broiling operations having, in the "Off" position of the knob, line switches held open to prevent energization of the heating element. By manipulation of the single knob, a user could obtain baking and broiling conditions and also secure various baking adjustments with the thermostat. To broil, the knob was turned to the right to 600°, the "Broil" position, and the heater energized at its highest heat. For baking, the knob was turned back to the right, and a thermostat, adjustable by rotation of the knob, then maintained the selected temperature.

It is of interest to note that the thermostat arrangement in the Electrochef range is as follows: When the single knob turns the electric current on and the temperature in the oven rises, expansion takes place in a tube which exerts pressure through a capillary tube—filled with an inert gas— attached to a sealed member in which is a copper bellows. The movement of the bellows then moves a contact carrying a bakelite lever which closes certain electric contacts. At the same time that these contacts are closed, a bi-metal blade and a mercury switch cause other contacts to close. The continued energizing of the electric circuit and the heat acts upon the bi-metal blade, causing it to bend, and the mercury switch moves in such a way as to open certain contacts. With the cooling of the oven, pressure is released in the bellows, opening other contacts, and as the bi-metal blade cools and straightens out from its formerly bending position, it again closes the circuit, energizing the wires and heating the oven to the temperature indicated on the knob. By this method of repetitious heating by closed electric circuits, succeeded by automatic cooling resulting from

open circuits, followed by automatic closing again of the circuits at a certain point of cooling of the bi-metal blade, the temperature of the oven, at the degrees of heat indicated by the setting of the knob, is approximately maintained. Appellee, however, points out that there was only one heating element in the oven in question used for both broiling and baking. In broiling, the food was placed on a rack below the heater, and, in baking, was placed above it.

Appellee's range of the year 1932, designated as Model KE–1163T, with the Bradbury three-heater arrangement, embodying the "balanced heat" idea, relied upon as the principal invention in issue in this case by appellee and heretofore discussed, had a single knob for the upper and lower baking heaters, for adjusting the thermostat switch, and for "Off." A separate knob controlled the broiling heater. With regard to the 1932 Model KE–1163T, appellee submits that it was unlike both Kahn patents, inasmuch as that range did not have all oven operations and circuits under the control of a single operating mechanism, but, rather, two knobs were required, one to turn on the baking elements, and set the thermostat, and the other, to control the broiling element separately.

The Hobson Patent of 1934 discloses a single knob for controlling the entire operation of the broil and bake elements of a gas range, as well as the thermostatic mechanism, and a positive "Off." It shows a gas range having an oven with a lower element for baking and an upper element for broiling, both connected to a source of gas power through a selecting valve controlled by a single knob. A thermostatic valve controls the temperature by regulating the gas flow to the baking element and is operated by an adjusting cam controlled by the single knob. The single control knob has "Off," "Broil On," "Oven On," and various temperature positions from 70° up to 550°. When the knob is in "Off" position, energization of both the bake and broil elements is positively prevented by the line valve which cuts the gas circuit thereto, and hence, operation of the thermostatic device at low temperatures can not energize the

bake element. When the single knob is turned to "Broil On," gas flows only to the upper element to energize the same, but no gas flows to the lower element since the valve prevents this. When the single knob is turned to "Oven On," gas flows only to the lower element, and further knob rotation, such as to 400°, adjusts the thermostat to the desired temperature. In baking position, the valve prevents energization of the broil element. Thus, the bake and broil elements can not be energized simultaneously. Appellee emphatically points out, however, that the patent applies to a gas range and not an electric range; and that the thermostat does not intermittently cut any heating elements or anything else on and off, but, rather, merely alters or modulates the rate of gas flow to increase or decrease the gas flame.

The so-called Myers Patent of 1935, No. 2,140,479, had a single dial or knob for operating one or both of two heating elements on an electric stove surface; for selective energization of both or one of the heating elements on thermostatic control; and for operating a positive means for preventing the closing of the thermostatic switch means when the knob was in the "Off" position. It is emphasized by appellee that in no way does the patent relate to oven heating units or to the control thereof, but only to the surface heaters for the cooking top of an electric stove.

The Fonseca Patent, No. 2,125,672, of 1934, shows clearly the liquid-filled bellows, and "snap action" arrangement like that used for the thermostat switch in appellee's construction and the Kahn patents. It relates to the thermostat switch and the dial for setting the temperature selected. It does not, as appellee points out, describe the additional switches or controls combined in the Kahn patents.

We have, then, these elements, admittedly old: the electric wires carrying the current; the knob or dial, with markings of temperature, with positions of "Off," "Bake," "Broil," and directions of rotation, thereon indicated; switches; thermostats with shafts, rollers, cams, springs, bellows, functioning as in the so-called Kahn patents. We also find certain patents for ranges—gas and electric—operated by a single knob, such as Hobson, Myers, and Electrochef. We find electric ranges where two knobs are used to carry out all the operations which are effectuated by a single knob in the Kahn patents. Does invention, then, reside in the fact that, in the Kahn patents, one knob, rather than two knobs, controls switches; connects or disconnects circuits to an electric power source; interconnects them to each other, and interrelates their operations; controls thermostatic mechanism for selecting and maintaining oven temperatures; and provides for the selective operation of all components for all oven operations—broiling, baking, and turning the current off, avoiding, at the same time, the simultaneous energization of the broiling and baking elements, and, in the "Bake" position, operating the two baking elements always in a predetermined temperature relationship?

We are of the opinion that these patents did not partake of the quality of invention. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; In Butex Gas Co. v. Southern Steel Co., 5 Cir., 123 F.2d 954, a patentee claimed that the main idea of his patent was to combine, in a gas dispensing system, all of the necessary valves, guages, and other safety appliances —which, in themselves, were old—in a single accessible unit, bringing all of these elements together in a compact relationship through the unitary fitting, rather than by the use of several such fittings, and eliminating the necessity of assembling many separate appurtenances and the possibility of installing the various valves in the wrong order or relation to each other. The court held that this was a combination of old elements; that the novelty, if any, consisted only in a different mechanical arrangement producing no different result, and since it was a mere aggregation, it was invalid for want of invention.

In Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 550, 62 L.Ed. 1196, the court held that a claimed patent of a combination of old elements involving no new cooperative function, and producing no new result other than

convenience and economy, was invalid. The patentee had contended that the simultaneous washing and wringing with the operation of the control handle of a washing machine embraced the advance over the prior art. The court declared, however, that no new function was evolved from the combination; that the new result, in so far as one was achieved, was only that which arose from the well known operation of each of the elements; that, while the patentee had produced a more convenient and economical mechanism than others who preceded him, such superiority did not make an aggregation patentable; and that, while the assemblage of the old elements and their operation in the manner indicated might save time, and the mechanism might meet with a readier sale than other similar devices, such advantages may result from mechanical skill and commercial enterprise and do not necessarily involve invention. In concluding its opinion, the court expressed itself along lines that are peculiarly applicable to the instant case, in stating that the patentee's "aggregation of elements may be likened to the operation of a number of different machines in a factory by power applied from the same line shaft, each operation contributing its separate part to the production of a given result. So in this instance we think the combination accomplished by (the patentee) fails to show that exercise of invention, producing a novel and useful result from the co-operating action of the elements, which is essential to distinguish patentable combination from an aggregation of old elements so placed by mechanical skill as to do work more rapidly and economically." See also Leonard v. Cutler-Hammond Mfg. Co., 2 Cir., 168 F. 249.

In our opinion, it is unnecessary for us to consider whether appellant's device was anticipated in any of the patents pleaded as anticipatory, or was in prior use. It is sufficient to say that the substitution of the one knob in this case, for the two, already in use, is not invention. It is also to be observed that the district court made no findings that the old elements constituting these patents performed any additional or different function in the combination than they performed out of it, and the absence thereof goes to the weight to be accorded the findings of patentability of the district court. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra.

"The grant of a patent is presumptive evidence of its validity and the finding of the District Judge as to a fact is entitled to great weight. But when the full facts as to what constitutes the invention are, as here, undisputed, it remains at last, for this court, giving due regard to the weight to be given to the grant of the patent and the finding of invention by the District Judge, to examine the record for itself and to determine whether, within the meaning of the statute conferring patent monopoly, there is invention and therefore patentability. The presumption of patentability which attends the grant of a patent cannot survive in the face of undisputed facts showing that there is no invention." Butex Gas Co. v. Southern Steel Co., 5 Cir., 123 F.2d 954, 955.

In accordance with our conclusions, the patent claims sued upon are invalid for want of invention; the judgment is reversed; and the case is remanded with directions to dismiss the complaint.