**E–Z PAINTR CORP. et al. v. THOMAS et al.**
**Civ. A. No. 8454.**

United States District Court
E. D. Michigan, S. D.
June 26, 1953.

Harness, Dickey & Pierce, Detroit, Mich., Charles J. Merriam, Schroeder, Merriam, Hofgren & Brady, Chicago, Ill., for plaintiffs.

Arthur Raisch, Barnes, Kisselle, Laughlin & Raisch, Detroit, Mich., for defendants.

828

KOSCINSKI, District Judge.

Plaintiff E-Z Paintr Corporation, as licensee, filed suit for infringement of two patents. During the proceedings the patentee, L. P. A. Touchett, was added as involuntary party plaintiff, and Earl E. Thomas as party defendant.

The patents in issue are No. 2,427,581 relating to improvement in paint applicators, granted September 16, 1947, on application filed April 4, 1945, and No. 2,444,584 relating to improvement in sloping bottom trays and support structures, granted July 6, 1948, on application filed October 12, 1945.

The defendants deny infringement and, by counterclaim, seek declaratory judgment of invalidity of both patents. The claims of both patents appear in the margin.[1]

### Findings of Fact

#### Paint Roller No. 2,427,581

1. Admittedly, the patent is neither on the roller nor the sleeve or cover of the roller, separately, but in the combination.

2. Rollers for application of paint to surfaces are old and all the component parts of the roller have been available for years. Touchett claims that he is the first to make a combination of the available materials, and that the invention resides in a combination of the roller with a resilient core, a sleeve between the core and a lamb's wool cover which is paint retaining, and that this is a novel construction, combination and arrangement of parts as described in the claims of the patent.

3. The specifications state that lamb's wool has been found highly desirable and successful for using with oil base paints, and that the sleeve of the invention is preferably made of a piece of lamb's skin with the wool side facing out, and, that

"It is believed that its deep pile of closely packed and exceedingly fine but highly resilient fibers which stand substantially on end more or less duplicate the action of a conventional paint brush during passage over a wall surface to be painted."

4. The pioneer rollers for application of paint consisted of cylindrical wooden dowels with either woven wool carpeting or mohair covers which were glued or tacked on to the dowels. About 1942 metal cylinder rollers came into use with either a one-piece metal cylinder or two half cylinders,

1. No. 2,427,581: 1. A paint applicator of the character described, comprising: a handle; a roller rotatably mounted on the handle and having circumferentially spaced yieldable wall surfaces extending for the full length of the roller and defining the maximum cross sectional dimension of the roller; a cylindrical backing element, form retaining in character, but yieldable under radially applied force telescoped over said yieldable wall surfaces of the roller so as to be held spaced from any unyielding portions of the roller; and a sleeve secured over the exterior of said backing element, said sleeve being of material having a relatively deep fibrous pile of exceedingly fine and closely packed fibers which substantially stand on end and mutually support each other, said fibers having a high degree of resiliency to provide a resilient paint retaining and distributing surface for the roller.

2. A paint applicator comprising a roller, a shaft, said shaft extending laterally through said roller and acting as a support therefor, longitudinally extending resilient members, said members having one of their longitudinal edges attached to said roller, the other edge extending outward therefrom, a cylindrical sleeve arranged to telescopically engage the outwardly extending edges of said resilient member, and a cover of material having a deep fibrous pile, said cover attached to said sleeve to permit removal of said cover with said sleeve from said roller.

3. A paint applicator of the character described comprising in combination a handle, a shaft, said shaft supported on one end by said handle, a roller, said roller consisting of a pair of cylindrical end bearings mounted to said shaft, a plurity of resilient members extending longitudinally with said shaft from one bearing to the other, said resilient members attached to said bearing at one of their edges and having the other edge extending outward from the peripheral face of said bearing, a sleeve, said sleeve forming the cylindrical backing element, said sleeve constructed of a material sufficiently resilient to retain its shaft, and a cover of material having a deep fibrous pile, said cover adherently attached to the outer periphery of said sleeve to permit its removal with said sleeve from said roller.

and a mesh or cardboard sleeve with cover, which could be slipped on or telescoped over the cylinder.

5. Rollers later appeared with lamb's wool covers, with either mesh or cardboard sleeves. A piece of lamb's skin was cut to fit the outside of the roller and tacked onto the cylindrical wooden dowel with the lamb's wool on the outside. With this innovation the rollers conformed to the description in the specifications of the Touchett patent. Defendants proved to the court's satisfaction that one Elmer Kramer, of Fond du Lac, Wisconsin, and one Carl J. Ernst, of Milwaukee, Wisconsin, both of whom are painters and decorators with more than twenty years experience in that trade, used this type of roller for stippling, painting, and decorating, in their respective localities, at least as early as March, 1941, and more than two years before Touchett's application was filed.

6. In 1942 Stanley Coughlan, doing business as Stan-Hall Company, manufactured for defendant Thomas Products a steel roller consisting of two half cylinders welded to the end cups, otherwise in all respects similar to Touchett's subsequently patented roller. There were four welding spots on each end of the Thomas roller, leaving two unwelded corners on each end of the roller to give it resiliency and the necessary spring tension for holding the woven wool carpet sleeve on the roller. Several thousand rollers of this type were delivered to defendant Thomas Products. Early in 1942, because of military restrictions, the supply of steel was unavailable for general industrial use and no more of these steel rollers were manufactured until late in 1945. The Thomas paint rollers were marketed and sold throughout 1942 to 1945. The only difference between the 1942 Thomas steel roller and the plaintiffs' steel cylinder described in the patent claims is that the Touchett cylinder is made of a lighter metal. In a pre-trial deposition Touchett makes the following statement:

> "I told you that there was lamb's wool rollers, and I want to say it without any question there was lamb's wool rollers prior to the time that I ever conceived a paint roller."

7. Several months before filing his application Touchett visited one Otto F. Gargen, owner since 1935 of a decorating company known as the Bro-Kade Wall Finishing Company in Milwaukee, Wisconsin, who showed Touchett a lamb's wool roller he used for applying oil base paints. Touchett, himself a painter, subsequently purchased a Thomas metal roller in a Milwaukee paint store, and also acquired a Sherwin-Williams Kem-Tone wooden dowel roller, called the Roller-Koater, with a woven wool carpeting cover, and made some experiments by tacking onto it a lamb's skin in the same manner as described in the specifications of the patent and as practised by others several years before Touchett's application.

8. Touchett claims as novel the cylindrical core of the roller which is described in connection with the appearance of the metal cylinder rollers in 1942. He merely substituted a metal screen sleeve for the cardboard and mesh sleeve of defendant Thomas' roller.

9. The "relatively deep fibrous pile" of the Touchett patent paint roller cover is an indefinite description of the material used in the cover of the roller. The woven wool carpeting and mohair covers are both relatively deep fibrous piles and were used long before Touchett. The word "relatively" is defined in the dictionary as "in a relative manner; in relation or respect to something else; not absolutely." Under this definition the fibers may be short, medium or long, depending upon the surface to be painted. It is worthy of note that the president of plaintiff corporation testified that plaintiff corporation was making and selling rollers with long fibers for painting fences. The language of all three patent claims concerning the use of a "deep fibrous pile" is too indefinite for the ordinary person skilled in the art to make a paint roller according to the claims of the patent, and the testimony just referred to would seem to indicate that.

10. The paint retaining feature relied upon by plaintiff is also relative, since it cannot be successfully argued that the paint brush does not have paint retaining qualities. In effect, the argument made here by plaintiff is that the cover of the Touchett

paint rollers retains more paint than the paint brush. That is not invention, but at the most, the use of a tool which enables the user to apply the paint to a somewhat larger area before another loading of paint.

11. The non-dripping feature claimed for the combination is not present in the claims, and while the specifications claim such a quality for the combination, the test made in court during the progress of this case did not completely demonstrate that quality.

## Paint Tray No. 2,444,584

12. The sloping bottom tray [2] is a paint container used in connection with painting by roller instead of by brush. With the advent of the first painting rollers it was necessary for a person using this method of painting to devise some convenient means of supplying the paint to the cover on the roller, as, obviously, the roller could not be conveniently or completely immersed in the relatively small pail-like container in which the paint was ordinarily purchased. The early roller painters resorted to the use of a cake pan, usually rectangular in form. The paint was poured into the pan and one end of the pan was propped up by a small block of wood, resulting in the concentration of the paint in the lower half portion of the pan, thereby making it possible to immerse the roller in the paint. The cover was saturated with paint and then rolled back and forth in the shore line of the pan to squeeze out the excess paint so as to prevent dripping and spattering. The roller was then ready for painting. The same method is used with the patent tray.

13. Any user of a paint brush has always forced out the excess paint in the brush by drawing it upwardly and against the inner periphery of the top of a paint container. As pointed out by Touchett in his specifications, the paint roller used with the paint tray simply duplicates the action of a conventional paint brush, since the roller, like the brush, is first saturated with paint and then squeezed out in the conventional way before it is applied to the surface to be painted. The preparation of the roller for painting is done in the same manner as was always done and is still being done with a brush—squeezing out the excess paint before the process of painting is begun.

2. No. 2,444,584: 1. A pan of the character described having a deep rear wall, a shallow front wall, two side walls, a bottom tapered upward from the lower edge of the rear wall to the lower edge of the front wall, said bottom attached to all walls at their lower edge, a vertical standard supporting said pan at its forward end said standard of a height to provide a horizontal alignment of the upper edges of said side walls and an inwardly projecting member attached to the inner face of said standard below said bottom.

2. A device of the character described comprising a rear wall, a front wall, said rear wall of a greater depth than said front wall, a bottom plate extending from the lower edge of said rear wall to the lower edge of said front wall, a pair of side walls extending from said tapered bottom to horizontal edges extending from the top of said rear wall to the top of said front wall, a vertical standard supporting said device at its forward end said standard of a height to place the upper edges of all of said walls in a horizontal plane, said vertical standard provided with a longitudinally disposed angular member extending from the inner face of said vertical standard toward and below the bottom of said device.

3. A tray of the character described comprising: a shallow, open-topped substantially rectangular receptacle having a botttom sloping from one end of the receptacle to the other so that one end is deeper than the other; a foot portion secured to the end portion of the receptacle of least depth and projecting downwardly an extent such that the lower edge thereof is vertically spaced from the upper edge of the receptacle a distance substantially equal to the depth of the opposite end portion of the receptacle so that said foot and the opposite end of the receptacle may support the receptacle with the top edges thereof substantially horizontal; and a ledge projecting in from said foot portion to underlie the bottom of the receptacle and form a hook adapted to engage under a support, like the step or top of a step ladder, to hold the receptacle thereon with its portion of least depth over the support, and its portion of greater depth projecting there beyond.

14. In 1942 the Sherwin-Williams Company marketed a cardboard tray for use with its Kem-Tone Roller-Koater. The printing on the tray contained the following directions for its use:

"1. Prop up end of tray as illustrated. Mix Kem-Tone according to directions and pour into tray at level shown by dotted lines.

"2. Dip the Roller-Koater into the deep edge of the Kem-Tone, rolling it toward the shallow end. On each dip, be sure to get the roller thoroughly and evenly covered. Shake Roller-Koater slightly to remove excess Kem-Tone."

15. In 1942; because of unavailability of steel for manufacturing of paint trays, as was the case with the rollers, the Sherwin-Williams Company continued making paint trays of cardboard until the war's end. Touchett was familiar with the Kem-Tone tray prior to filing his application in the Patent Office, which, understandingly, was not on the tray alone, but in a combination of the tray and hook or vertical standard in the front end of the tray, which is also provided with a ledge or annular member for hooking the tray on a stepladder.

16. An object of the tray invention is stated to be a device that may be supported from the rung of a ladder in a manner to afford convenience for the operator. Batherman No. 1,858,656 with support for blowtorches on stepladder, Upthegrove No. 2,-051,060 with detachable pail or like support for ladders for use by painters, Hickey No. 2,473,951 detachable tray which is light, strong and durable and can be quickly applied to or removed from a stepladder, the French patent, Gouel No. 779,845 showing adjustable tray, are prior art patents, anticipating the Touchett patent.

17. Interference proceedings in the Patent Office resulted from the nearly simultaneous filing of applications for improvement in sloping trays with supporting structures. Touchett's application was filed October 12, 1945, and the application of William R. Faust on October 15, 1945. Before any determination of the interference proceedings had been made, plaintiff E-Z Paintr Corporation purchased the Faust application and obtained from Faust a written priority concession, following which the interference was dissolved because of the common ownership. In the infringement proceedings before this court Faust still maintained that he was the prior inventor.

18. There is no documentary evidence showing that Touchett had the tray and hook covered by the claims in issue prior to his filing date of October 12, 1945, nor did he show any actual tray in support of his claim of prior invention. Faust had a tray exactly as shown in his Patent No. 2,444,096 as early as June 1945. The exhibits in the interference proceedings were not withdrawn and they were eventually destroyed by the Patent Office.

19. The tray and its supporting device, both in hook and ledge form, are old elements used in aggregation here. Each performs the same function in the combination as it has always performed when used separately.

The claims of a patent must be described "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * to make, construct, compound, and use the same; * * * and he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention". 35 U.S.C.A. § 33. The three claims of patent No. 2,427,581 do not satisfy these requirements of the law, as already pointed out. General Electric Company v. Wabash Appliance Corporation, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402; United Carbon Co. v. Binney & Smith Co., 317 U.S. 288, 63 S.Ct. 165, 87 L.Ed. 232; Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3.

Invention may be predicated upon an aggregation of old parts or elements only if, in combination, they perform or produce a new or different function, result, or operation than that theretofore performed or produced by each separately. A patent for a combination which only unites old elements with no change in their respective functions obviously withdraws what already is known into the field of its

monopoly and diminishes the resources available to skillful men. General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F.2d 645, 659, citing Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008. See also Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. "There is no invention in merely selecting and assembling * * * the most desirable parts of different mechanisms in the same art, where each operates in the same way in the new device as it did in the old, and effects the same results." Elite Mfg. Co. v. Ashland Mfg. Co., 6 Cir., 235 F. 893, 895.

No showing was made by plaintiffs that the aggregation of old parts now used in the combinations covered by patents No. 2,427,581 and No. 2,444,584 perform or produce any new result, other than convenience and economy, and, therefore, the combinations are not patentable. Patentee, by his inventions, has added nothing to the total stock of knowledge in the field but has merely brought together segments of prior art and claims them in congregation as a monopoly. The functions of the paint roller or tray were not altered. Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 550, 62 L. Ed. 1196; General Motors Corp. v. Estate Stove Co., supra, 201 F.2d 663.

A mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or. degree, the substitution of equivalents doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent. Yost Electric Mfg. Co. v. Perkins Electric Switch Mfg. Co., 6 Cir., 179 F. 511; Wolverine Fabricating & Mfg. Co. v. Detroit Gasket & Mfg. Co., 6 Cir., 148 F.2d 399.

The substitution of a "deep fibrous pile sleeve", whether of wool or wool type, for the woven wool carpeting sleeve, is the substitution of materials or a selection of elements from the prior art, and is not invention. Newcomb, David Co. v. R. C. Mahon Co., 6 Cir., 59 F.2d 899; R. C. Mahon v. Detroit Steel Products Co., 6 Cir., 107 F.2d 335; Wolverine Fabricating & Mfg. Co., Inc., v. Detroit Gasket & Mfg. Co., 6 Cir., 148 F.2d 399.

Plaintiffs have placed in the record evidence of commercial success of the roller and tray. Commercial success will balance the scales in favor of validity of a patent only in cases where the issue of patentability is close, but the facts do not present such a situation here.

### Conclusions of Law

1. Each of the patents described lacks the novelty, utility, and advances in the art necessary to establish invention.

2. The improvements claimed by combining existing elements as described in the claims of each patent are aggregations of known and existing elements and lack the necessary requirements under the Patent law for invention.

3. All claims of Patent No. 2,-427,581 and all claims of Patent No. 2,-444,584 are invalid for want of invention and novelty. Patent No. 2,427,581 is also invalid for indefiniteness of all its claims.

Defendants are entitled to a judgment dismissing plaintiffs' complaint and granting their counterclaim declaring all claims of both patents invalid.